[Crim. No. 564.   Fourth Dist.   July 3, 1945.]

THE PEOPLE, Respondent, v. EDDIE LEE HINES et al.,
Defendants; HAZEL COOPER et al., Appellants.

Matot & Seelig for Appellant Cooper.

No appearance for Appellant Brooks.

Robert W. Kenny, Attorney General, Frank Richards, Deputy Attorney General, C. G. Halliday, District Attorney, and L. J. Mouser, Chief Deputy District Attorney for Respondent.

BARNARD, P. J.—The defendants were charged, in two counts of an information, with conspiracy to commit theft and with grand theft. The defendant John Doe, who was referred to at the trial as a man named Roberts, seems to have been a mysterious stranger whom none of the others knew and who was never apprehended. The defendants Hines and Davis pleaded guilty. The jury acquitted Geneva Brooks and found James Henry Brooks and Hazel Cooper guilty. The latter two have appealed from the judgment and from an order denying a motion for a new trial. No briefs have been filed for Brooks, and we will refer to Cooper as the appellant.

There is no dispute as to the general facts. All of the defendants lived in or around Los Angeles, Brooks living two doors from Cooper. On Saturday, September 23, 1944, all of the defendants, except Cooper, went to Brawley in two trucks. One of these, referred to as the "bob-tail," was rented from the Mercury-U-Drive. The other, a truck and trailer, referred to as the "semi," was owned by Cooper. They arrived at Brawley early Sunday morning and waited for night. After dark that night they went out to two nearby ranches and stole 322 bales of hay. Two hundred and fourteen bales were loaded on the "semi" at one ranch and 108 bales were loaded on the "bob-tail" at another. They returned to Los Angeles, arriving there Monday forenoon, and both loads of hay were taken to the ranch of a Mr. Mushagian, near Downey. They had given fictitious names at weighing and inspection stations. Mushagian agreed to buy the hay on the "semi" but refused to buy that on the "bob-tail," saying it was inferior in quality. The "bob-tail" and its load was driven to Cooper's house and Cooper was informed that Mushagian would not buy that hay. Cooper ordered the "bob-tail" driven back to Mushagian's and went there himself. He tried to persuade Mushagian to buy that load of hay and when he again refused Cooper suggested other places where he thought it could be sold. Although it is claimed that Mushagian was buying the hay from Brooks he paid Cooper $208 as part of the purchase price on Monday, September 25. Mushagian testified that Brooks was not there when he paid Cooper, that nothing was said as to why he should pay Cooper rather than Brooks, and

that "I tried to stall him (Cooper) on paying the money there, and he needed the money bad, and I let him have some of it and let the rest of it go for a little while." Cooper testified that he kept $50 out of the $208 for the rent of his truck and that he gave the rest to Roberts. A day or two later, Cooper's truck was located at the Mushagian ranch, where it had been left, and most of the defendants were arrested.

The appellant's main contention is that the evidence is not sufficient to sustain his conviction on either count. While it is conceded that it is sufficient to establish the guilt of Brooks it is argued that there is nothing to connect Cooper with any criminal act; that all that appears is that he rented his truck to Brooks and collected some of the money for the hay in order to accommodate Brooks and to collect the rental for his truck; and that it is obvious that if he had been a party to the illegal acts he would have had his truck ready and available when the others first started out. The argument thus made ignores much of the evidence and other inferences which could well have been drawn.

Cooper testified that Roberts asked him on Saturday morning if he wanted to make a trip; that he replied in the negative, as his truck was loaded, and also told Roberts "I will rent it but I won't be responsible"; that later that morning Brooks talked to him "about the same business"; and that he told Brooks that he would rent the truck to him for $50 "providing I got unloaded in time." It appears that the others started out on Saturday afternoon in the "bob-tail," having arranged that they would drive slowly so that Cooper could catch them if he got his truck unloaded soon enough. Cooper, driving an automobile, caught up with them after they had gone some 14 miles and had a talk with Brooks. Brooks then returned to Los Angeles with Cooper, secured Cooper's truck, caught up with the other truck at Colton and the two trucks proceeded to Brawley. Hines testified that on the return trip they stopped at Colton where Brooks called Cooper on the telephone and then told Hines that Cooper would meet them at Mushagian's; that Cooper was not at Mushagian's when they arrived there; that he went to Cooper's house and reported that Mushagian would not buy the hay on the "bobtail"; that Cooper took him back to Mushagian's but Mushagian still refused to buy that load; that Cooper then instructed him to take that load to another man who he thought

would buy it; that he and Davis then sold the hay on the "bob-tail" to various parties; and that they then returned to Cooper's house where they picked up the sideboards belonging to the "bob-tail" truck and returned certain hooks and ropes belonging to Cooper. Brooks admitted that the hay was stolen and his testimony is much the same as that of Hines, except that he denied that he telephoned to Cooper from Colton. Cooper's testimony is the same on many of the facts although he testified that he did not know the hay was to be stolen; that he rented his truck to Brooks for $50; that he was told that his truck had broken down at the Mushagian ranch; that he went there to repair it; and that he took the $208 payment on account because Mushagian did not want to pay Brooks since he knew the truck belonged to Cooper. Cooper's testimony was thoroughly impeached by statements he made immediately after his arrest, at which time he did not know that the officers had located his truck. At that time he told a story which was greatly at variance with the one he told on the stand. In addition to many other inconsistencies and contradictions he said, immediately after his arrest, that his truck was at home on this Monday; that he had not driven east of Los Angeles to catch up with the other truck on Saturday; that he did not know his truck had been at Mushagian's; that he did not know Mushagian; that he did not know the location of Mushagian's place; and that he did not receive $208 from Mushagian.

The fact that Cooper's truck was used on this occasion is not the only evidence which tends to implicate him in the commission of these crimes. He admits that he talked to Roberts on Saturday morning about this trip and later to Brooks about "the same business." While he claims he was not anxious to rent his truck he hurried to unload it and then caught up with the others who were on their way. The sideboards from the other truck were stored at his home and extra ropes and hay hooks were taken from his home and returned after the mission was completed. He met the trucks at Mushagian's when they arrived there or came soon after, and the evidence justifies the inference that he had directed where the loads of hay should be taken. The evidence as to why he went there is conflicting and the jury may well have refused to accept his explanation therefor. Much of the testimony indicates that Cooper had considerably more to do with selling the load of hay to Mushagian than merely accom-

modating Brooks and getting his rental for the truck. He offered no explanation for the fact that while he rented the truck to Brooks who sold the hay to Mushagian, he gave the rest of the money he received to the unknown man Roberts. It is argued that the fact that he did not try to collect the balance of the selling price from Mushagian strongly indicates that he was not interested in the proceeds from the hay, other than in collecting the rental for his truck. The fact that he was arrested so soon thereafter suggests a more plausible explanation. Cooper not only took a very active part in the Mushagian deal but he showed considerable activity and interest in disposing of the other load of hay. Moreover, his testimony was thoroughly impeached by the story he told immediately after his arrest. The difference between his stories is not only highly suggestive but indicates why some of the other evidence was not believed by the jury. Some suggestion is made that testimony of the accomplices Hines and Brooks was not sufficiently corroborated. Ample corroboration appears not only in the testimony of other witnesses but in that given by the appellant himself.

The evidence, with the reasonable inferences therefrom, is amply sufficient to support the jury's conclusion that the appellant was an active participant in these crimes and to support the verdict and judgment.

The appellant next complains of what he terms "misuse of judicial functions by the court." It is first contended that no notice was given to the attorneys for the appellant which would enable them to examine the transcript, and call any misstatements therein to the attention of the court, before the same was settled. There is nothing in the record to support this contention and it is asserted in respondent's brief that the original clerk's and reporter's transcripts bear the notation, signed by two of the attorneys for the appellant by one of them, to the effect that a copy thereof was received on January 10, 1945, the same day on which copies were received by the district attorney. This is not denied by the appellant. The original transcript was lost and by stipulation a copy thereof was filed and used on this appeal. No prejudice appears and it is not even claimed that either transcript contains any misstatements which might or could have been called to the attention of the court.

It is further argued that the court having set the

hearing of the motion for a new trial for December 22, 1944, vacated that order and reset the hearing for an earlier date, and that the court was without jurisdiction to vacate its previous order in this regard. It appears in this connection that the verdict was rendered on November 30, 1944; that an application for probation was made and the hearing thereon and the imposition of sentence was continued to December 15, 1944; that on that day the application for probation as to Cooper was denied, whereupon his counsel moved for a new trial; that on the same day the motion for a new trial was set for hearing on December 22, 1944; that later the same day, in the presence of the appellant and his counsel, that order was set aside and the hearing of the motion reset for December 16, 1944; and that on the latter date this motion was denied. There is no showing that any prejudice resulted to the appellant and there is nothing to indicate that a later hearing of that motion would have had any possible effect on the granting or denial of a new trial. ■ Not only was it within the discretion of the trial court to deny the motion for a new trial without hearing argument thereon (*People* v. *Norton,* 45 Cal.App.2d 789 [115 P.2d 44]), but counsel for the appellant had then had more than two weeks after the verdict was rendered, and it is not even contended that a later date would have enabled them to raise points or reasons for a new trial which were not then available to them. Neither lack of jurisdiction nor possible prejudice appears.

The judgment and order denying a new trial are affirmed.

Marks, J., concurred.